VINCENT DAVID KOFRON,

        Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.

No. C11-3050-MWB

**REPORT AND RECOMMENDATION**

---

### *Introduction*

The plaintiff, Vincent David Kofron, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Kofron contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled. For the reasons that follow, the undersigned recommends the decision be affirmed.

### *Background*

Kofron was born in 1964. AR 167-68. He has a GED and approximately two years of college credit. AR 50-51, 230-32, 377. His past work includes security guard, parts picker and dishwasher/kitchen worker. AR 52-56, 90, 226, 335.

Kofron applied for DIB on April 29, 2008, alleging disability beginning on March 28, 2008, due to sleep apnea, schizoaffective disorder, depression, hypertension, arthritis and high cholesterol. AR 167, 185. The Commissioner denied Kofron's application. AR 103-07. Kofron requested a hearing before an Administrative Law Judge ("ALJ"). AR 108. On September 29, 2009, ALJ Edward

Pitts held a hearing in which Kofron and a vocational expert ("VE") testified. AR 46-99. On November 18, 2009, the ALJ issued a decision finding Kofron was not disabled. AR 16-24. Kofron sought review by the Appeals Council and submitted additional evidence. AR 36-43. The Appeals Council considered the additional evidence but found that it did not provide a basis for changing the ALJ's decision. AR 2. The Appeals Council therefore denied the request for review and the ALJ's decision became the final decision of the Commissioner. AR 1-4; 20 C.F.R. § 404.981.

On September 26, 2011, Kofron filed a complaint in this court seeking review of the Commissioner's decision. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues and the matter is now fully submitted.

## Summary of Evidence

### A. Dr. Stacey L. Smith

Dr. Smith has been Kofron's treating psychiatrist since April 2005. AR 290, 358. While most of Dr. Smith's notes are illegible, the record does contain some typed reports. In a report dated May 14, 2007, Dr. Smith noted that Kofron had "the same ongoing sleep problems that he's had for years and years, complicated by his working night shifts." AR 286. She reported that Kofron said he wore his continuous positive airway pressure ("CPAP") machine most of the time and he was taking an occasional catnap at work. *Id.* Kofron told Dr. Smith that his Seroquel medication was "working fine" and his Xanax medication was keeping him in "the middle," which he described as "fine, and I'm not worrying so much." *Id.*

Dr. Smith also noted that Kofron reported drinking 24 cans of beer per week, but said he was trying to stay away from it. *Id.* He had not been to an Alcoholics Anonymous ("AA") meeting lately because his father had been hospitalized. *Id.* Dr.

Smith encouraged him to abstain from alcohol and Kofron stated he was going to attend AA again.  AR 286-87.

In her May 14 report, Dr. Smith also stated they discussed Kofron's job aspirations and that he exhibited a "hint of grandiosity."  AR 286.  For example, he had offered to build her advanced medical devices.  As for his mental status, she stated:

> His mental status is the same as always.  His mood is very pleasantly, consistently slightly elevated without agitation.  He is extremely personable, talkative, but with some insight problems.  I don't think he realizes how much training would be required for some of the job possibilities he's considering.  Not suicidal, homicidal, or psychotic.

*Id.*  She noted Kofron was working evening and weekend hours at a nursing home.

Another typewritten report is available from July 12, 2007.  AR 255.  In that report, Dr. Smith wrote that Kofron's father had passed away but things were calming down and Kofron seemed at his baseline during the session.  *Id.*  Kofron told Dr. Smith he was going to start working an earlier shift at work from 4:00 p.m. to 12:00 a.m.  *Id.*  Dr. Smith said he was happy about this and was enjoying his job at the nursing home, especially the people.  *Id.*  Kofron stated that he was still looking for additional part-time work and had thought about additional schooling.  *Id.*

In July 2007, Kofron was still having difficulty abstaining from alcohol.  *Id.*  He told Dr. Smith he would occasionally drink too much beer when he was feeling frustrated.  Dr. Smith stated Kofron "is always a little up and can border on a bit of agitation."  *Id.*  She suggested he take an extra Xanax instead of turning to alcohol.

At this appointment, Dr. Smith described Kofron's mental status as "calmer on exam, seems at baseline, pleasant, fun to talk to as usual."  *Id.*  He appeared well-groomed and was "personable as ever."  *Id.*  He had no new complaints and no prescriptions were issued.  Kofron was advised to continue his medications as usual, with the exception of taking extra Xanax if needed, and was again advised to abstain from alcohol.  *Id.*  Dr. Smith also discussed diet and exercise with him and encouraged him to switch to lower calorie beverages.  *Id.*

Dr. Smith wrote a letter to the Social Security Administration on May 27, 2008. AR 290-91. She explained that Kofron is diagnosed with schizoaffective disorder, mixed type, and alcohol abuse. *Id.* She stated he takes "considerable psychiatric medication yet continues to have some difficulty" and that "[w]hile he drinks a few too many beers . . . this has not caused a significant clinical problem." *Id.*

As for his ability to work, she wrote that he was working part-time as a security officer but was terminated several months prior. She said he spends many hours on the Internet looking for other possible employment, but that he is a bit grandiose about his capabilities. She did not believe he was capable of following through on his idea to get additional training in order to take a higher scale job. *Id.* She stated that Kofron would perform "reasonably at a simple job," and that he could not get anyone to hire him despite much effort, writing: "I am convinced his interpersonal manner puts people off. They can tell he is 'not right.'" *Id.* She further noted that Kofron's mother reported his house is messy and disorganized with papers everywhere. Dr. Smith wrote, "He cannot seem to effectively execute a task from start to finish. He would have great difficulty with any type of a desk job for this reason." *Id.* Dr. Smith stated that to her knowledge, Kofron had never sustained full-time work successfully over time and opined that this was due to his psychiatric status, not to his underlying character or lack of motivation.

Dr. Smith explained that Kofron's symptoms "wax and wane." *Id.* She said, "He becomes revved-up (hypomanic) alternating with periods of irritability where he can be loud and difficult with his family." *Id.* Kofron had been hospitalized in the past, but not while she treated him. She said that he attends every appointment, is always on time, and is perfectly compliant with his medications. *Id.*

Dr. Smith wrote another letter submitted to the Appeals Council dated July 15, 2009. AR 358-59. In this letter she noted that despite aggressive treatment with medication, Kofron continued to have difficulties. *Id.* He wore dirty clothing, appeared slovenly, sometimes had body odor, was "substantially overweight" and had

visible lesions on his face due to psoriasis. *Id.* Dr. Smith stated that the combination of these issues made it unlikely that Kofron would be hired. *Id.* She noted that while Kofron has a very friendly and outgoing manner, he is extremely loquacious and speaks in an overly loud voice, which can be off-putting. *Id.* Dr. Smith added that Kofron becomes easily agitated when things do not go his way or if limits are set. *Id.* She described him as "incredibly disorganized" and stated he has "profound difficulty with task completion." *Id.* She said Kofron's mother lives next door to him and supports him, but finds him "a handful to manage." *Id.*

As for his impairments, Dr. Smith explained that although Kofron occasionally abuses alcohol, this is not his primary problem and does not affect his psychiatric difficulties. *Id.* She stated Kofron does not have anti-social personality disorder or anti-social traits to his underlying personality structure. *Id.* In her opinion, Kofron does not have "the sufficient mental/emotional capacity to perform with sufficient pace and performance to sustain gainful employment over time." *Id.* She added that his condition is chronic and lifelong and she doubts his level of functioning would improve significantly even with different pharmaceutical approaches. *Id.* She concluded "without his family's help, Vincent would be homeless." *Id.*

## B.    *Dr. James G. Avery*

Dr. Avery has treated Kofron for physical impairments. In February 2008, Dr. Avery saw Kofron for pain and stiffness in his left 5th finger and soreness in his knees. AR 330. In August 2008, Kofron still experienced knee pain. AR 332. Dr. Avery noted that Kofron had been fired for sleeping on the job. *Id.* Kofron was diagnosed with osteoarthritis of the knees. *Id.* In September 2008, Kofron complained of low back pain. AR 333. In January 2009, Kofron saw Dr. Avery with concerns about his skin. AR 334. He was diagnosed with psoriasis. *Id.* Kofron continued to follow-up with Dr. Avery for his back and knee pain, but no functional limitations or abnormal findings were noted outside of soreness and tenderness. AR 382-416.

## C.    Dr. Edwin Wolfgram

Dr. Wolfgram conducted an independent medical examination on October 8, 2010.  His report was submitted to the Appeals Council but not reviewed by the ALJ.  AR 368-79.  Dr. Wolfgram based his findings on a personal interview and a review of the medical records.  AR 369.  He found that Kofron was markedly limited in several areas including: ability to understand, remember, and carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to sustain ordinary routine without supervision, ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  AR 371-73.  He assigned a Global Assessment of Functioning ("GAF") score of 32[1] and concluded:

> This 46-year-old gentleman is not able to adjust to a work environment.  He has worked for five years total, and then irregularly.  He attended special education classes in grade school.  He quit high school in the 10th grade.  He passed his G.E.D. (he is smart enough).  He acquired a smattering of college credits over thirty years.  His most active career has been hanging around colleges.  He now wants to go to Iowa to participate in The Green Revolution.
>
> Mr. Kofron has a life-long learning disability.  He also has a life-long major psychiatric disorder—Schizoaffective Disorder.  He has received extensive psychiatric care to include the vigorous use of psychoactive drugs throughout his adult life.  He is currently under psychiatric care.

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV).  A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *Id.*

As the current psychiatrist has documented, "Mr. Kofron would be homeless if not for the support of his mother." His mother is now age 84 with dwindling resources. Drinking beer has been mentioned in the file. The alcohol use is not substantive. His family has wished alcohol was the problem, then Vincent would be less likely considered to have a mental illness.

This examiner does recommend social security coverage. Mr. Kofron is entitled to a benefit that would give him some standing.

AR 377.

Dr. Wolfgram stated that Kofron had "never been able to function" and stated "the life-long history tells it all." AR 374. He attributed Kofron's ability to work in the past to the medication he was taking, stating "the drugs must have been just right." AR 375. He estimated that the earliest date that the description of Kofron's symptoms and limitations applied was when Kofron was six years old and in grade school. *Id.*

## D.    *Consultative Examination*

Lynn Mades, Ph.D., performed a consultative examination on July 22, 2008. She noted that Kofron's allegations included sleep apnea, schizoaffective disorder, depression, hypertension, arthritis, and high cholesterol. AR 292-95. Dr. Mades noted that Kofron was well-groomed and his hygiene was within normal limits when he appeared for this appointment. AR 293. She administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) which resulted in a Verbal IQ of 100, a Performance IQ of 83, and a Full Scale IQ of 91, indicating average range of cognitive functioning overall. AR 294. She noted that during the test, Kofron attempted all the items presented and he maintained good persistence with the tasks. AR 293. She stated that his frustration tolerance appeared good, and he did not exhibit any unusual behaviors. AR 293-94. She remarked that he was quite verbose and his responses were "frequently slightly off-target" making simple responses more complicated than necessary. AR 294. She concluded that his overall motivation and effort were good.

AR 294. Dr. Mades pointed out that while there was a significant difference between the verbal and performance scale scores, it was unknown whether that reflected a specific learning disability. AR 295. She found no clear evidence of cognitive impairment by history or presentation. *Id.*

### E. *Washington University Sleep Center*

Kofron was seen at the Washington University Sleep Center on July 17, 2006. AR 322-24. His chief complaint was that he had difficulty sleeping, which had been a problem for him the past seven years. *Id.* In his past medical history, the doctor noted his depression and schizoaffective disorder, which "resulted in multiple in-patient hospitalizations." *Id.* Kofron explained that his work schedule required him to work from 12:00 a.m. to 8:00 a.m. on the weekends. He stated that he would try to sleep on a normal schedule during the week, but had difficulty doing this and would often wake up at 2:30 or 4:00 a.m. *Id.* The doctors assessed Kofron with possible obstructive sleep apnea and circadian rhythm shift-work disorder. *Id.* Kofron was scheduled for a split-night polysomnogram. *Id.*

The polysomnogram came back abnormal because it provided evidence of mild obstructive sleep apnea syndrome and moderate fragmentation of sleep. AR 321. A CPAP study was then performed, which resulted in normal sleep efficiency. AR 320. CPAP was deemed an effective treatment for Kofron's obstructive sleep apnea syndrome. *Id.*

At a follow-up on September 25, 2006, Kofron stated he was wearing the CPAP mask three to four nights a week for approximately four hours per night. AR 317. His only explanation as to why he did not wear it every night for the entire night was that he did not like the mask because there were too many parts to manage and the headgear was difficult to tighten. *Id.* The doctor discussed the importance of using the CPAP nightly and for the entire duration of sleep. AR 318. She also advised him that

drinking alcohol may worsen his sleep apnea and she prescribed Ambien CR. AR 318-19. Kofron was instructed to follow-up two to three months later. AR 319.

Kofron returned in November 2006 and was referred to a psychologist. AR 315-16. Kofron thought his sleep difficulties might be attributed to the little activity he engaged in during the day and mentioned that he would like to exercise more. *Id.* Kofron also mentioned that he would drink beer during the day because he was bored and estimated he drank two 24-ounce cans of beer a couple times per week in order to "calm his mind." *Id.* The psychologist made the following observations:

> Mr. Kofron was very tangential and it was difficult for him to describe his typical day. When asked questions, he would switch to an unrelated topic or would switch back to a previously discussed topic. He could only vaguely answer questions, but then gave unnecessary details about unrelated topics. For example, when asked if he gets out of bed at night when he cannot sleep, he responded that he enjoys taking car trips to the country to help him relax where he can buy inexpensive meats and then listed all of the meats he usually buys. It is difficult to know how well he will remember what we discussed or what we have suggested.

*Id.* She reviewed sleep hygiene with Kofron which included no alcohol before bedtime and getting physical exercise at least 30 minutes a day. *Id.*

Kofron next saw Dr. Darla Darby, a neurologist, at his follow-up appointment a year later. AR 312-14. Kofron reported that he had found a comfortable way to wear his mask several weeks earlier and had been wearing it every night without difficulty. *Id.* He stated that he was feeling better during the day and sleeping better through the night. *Id.* He also reported that he had decreased his alcohol intake, although the doctor noted later in her report that he was drinking up to a six-pack of beer per night. *Id.* Kofron explained that the change in his work shift schedule had helped him better maintain regular sleep. *Id.* Kofron was encouraged to wean and discontinue alcohol and to continue exercising. *Id.*

## F. State Agency Medical Consultant

Kyle DeVore, Ph.D., performed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique on August 11, 2008. AR 297-310. In his Psychiatric Review Technique, he found Kofron had no limitations in activities of daily living, moderate limitations in maintaining social functioning, mild limitations in maintaining concentration, persistence and pace, and that there was insufficient evidence to determine if Kofron had repeated episodes of decompensation of extended duration. AR 308. Dr. DeVore concluded that Kofron's activities were largely intact with some limitations. His intellectual capacity at worst was low-average. AR 310. He noted that Kofron had advanced education and had worked in the same field for over 10 years. There was no evidence that Kofron lacked the capability of performing at least simple work-related tests. AR 310.

In his Mental Residual Functional Capacity Assessment, Dr. DeVore found moderate limitations in Kofron's ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. AR 297-98. In all other areas he was "not significantly limited." *Id.* In his summary, Dr. DeVore stated Kofron retained the capacity for performing simple work-related tasks and that social restrictions would help him deal with stress. AR 299.

## G. Plaintiff's Testimony

Kofron testified that his most recent work was as a watchman and he had been terminated for sleeping on the job. AR 52-53. Kofron stated that he had not been sleeping, but simply resting his eyes while monitoring traffic on the property when the

executive director came by and honked his horn.  *Id.*  Kofron had worked as a watchman for approximately two and a half years.  *Id.*  He explained the duties of his previous jobs as a security guard, parts picker in an auto parts warehouse and dishwasher/kitchen worker.  AR 53-54.  Kofron testified that the most he would occasionally lift was 50 pounds as a parts picker and 10 to 20 pounds as a dishwasher/kitchen worker.  AR 54-55, 57-58.

Kofron also testified about his medical conditions.  He stated that he was no longer using the CPAP because the face mask was damaged but he was planning to get a new one at his next evaluation.  AR 60.  He stated that he had arthritis in his spine, elbows, toes, right knee and possibly the left knee.  AR 61.  He explained that he was taking Celebrex and his doctor had not discussed any surgical solutions or knee replacement.  AR 62-64.  He had not had any x-rays or MRIs.  *Id.*  Kofron testified that with his arthritic conditions, he could probably walk a mile before his legs would start to cramp, even with the help of his medication.  AR 65.  He estimated that he could comfortably sit for up to four hours and would then need to take Ibuprofen or another pain reliever to feel comfortable again.  AR 68.  Kofron also thought he could frequently lift 20 pounds during the day.  AR 69.  He stated that the pain in his knee was about 7 or 8 out of 10 on an average day and once or twice a month would be an 8 or 9.  AR 87-88.  Kofron indicated that his hypertension and high cholesterol were under control.  AR 85.

As for his psychological condition, Kofron testified that for the most part his medication was effective.  AR 69.  He stated that he had done well in school with his psychological condition but would reach a point at which he felt very discouraged and frustrated.  AR 70.  When asked what he thought caused him to feel like that, Kofron responded "[a] lot of it is interest, I think" and also attributed it to the lack of a support network.  AR 70-71.  Kofron testified that he was in special education classes for behavioral problems up to the age of eight or nine.  AR 88-89.  With regard to

depression and anxiety, he indicated that his depression was under control but anxiety was still a problem and was related to his drinking. AR 85.

The ALJ asked Kofron if he could go back to his previous work as a security guard. Kofron thought the amount of walking it required would prevent him from doing that job but said he could probably do a security guard job where he could alternate sitting and standing. AR 72-73. When asked why he was not doing that type of work, Kofron said that no one would allow him to carry a weapon or pepper spray, but could not explain why he thought that. AR 73-74. He later clarified that he did not think there was anything about his condition that would dissuade a potential employer from allowing him to carry pepper spray. He stated that he was more concerned about his own protection and did not feel he could perform a security guard position without at least having pepper spray and handcuffs available. AR 81-82. When asked again if he felt like he would be able to perform a security guard job with a sit/stand option he stated, "I don't think I want to do that for a living, you know, anymore." AR 83. He went on to say "I think I have more to offer to the general public and to society at large, if you like. You know, I can do more than guard a parking lot. I, again, like I told everybody that's in this room, that I've got more talent or talents than that." AR 83-84.

The ALJ also asked Kofron about his daily activities. He testified that he lived by himself and could perform household chores, go shopping, and handle money by himself. AR 74-75. He had his driver's license and was able to drive without difficulty. AR 76. During the day he would do yard work and use the computer for news, research and job hunting. AR 75. He explained that he had spent time with friends in the past, but not recently. AR 76. He also said he had stopped smoking but still drank alcohol. AR 76-77. He had been attending AA for about a year and was going to start a new medication soon to help him resist alcohol. AR 77-78.

## H. Vocational Expert Testimony

Darrell Taylor, Ph.D., testified at the hearing as a vocational expert. AR 89-95. Dr. Taylor identified Kofron's past work and characterized the security guard position as light and semi-skilled, the parts picker position as medium and unskilled, and the dishwasher/kitchen worker as medium and unskilled. AR 90. The ALJ asked the VE to consider a hypothetical in which a person was the same age and had the same education and work experience as Kofron. This hypothetical person also had psychological limitations so he could only perform simple, routine work, could have no interaction with the general public, and his interaction with co-workers and supervisors could not exceed two-thirds of the work day. AR 90-91. The ALJ also ruled out any kind of desk work that would require a lot of concentration based on Dr. Smith's opinion. *Id.* The ALJ asked the VE whether this person could perform any of Kofron's past work and the VE answered "no." *Id.* However, the VE stated that other work in the regional and national economy is available to someone with these limitations. *Id.* Those jobs are considered light, unskilled work, and include janitorial cleaning positions and hand packer positions. AR 91-92. Those positions include a sit/stand option, although the VE indicated that a person would have to sit or stand a minimum of 30 minutes at a time to remain on task. AR 94.

### Summary of ALJ's Decision

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

(2) The claimant has not engaged in substantial gainful activity since March 28, 2008, the alleged onset date.

(3) The claimant has the following severe impairments: alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension, and degenerative disc disease of the left knee.[2]

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; and performing more than simple work with no interaction with the general public and no more than frequent contact with co-workers or supervisors.

(6) The claimant is unable to perform any past relevant work.

(7) The claimant is 45 years old, born on April 12, 1964, which is defined as a younger individual age 18-49, on the alleged disability onset date.

(8) The claimant has at least a high school education and is able to communicate in English.

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(11) The claimant has not been under a disability, as defined in the Social Security Act, from March 28, 2008 through the date of this decision.

AR 18-24. The ALJ found that Kofron has severe impairments of alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension and arthritis of the

---

[2] Kofron's actual diagnosis is arthritis of the left knee. AR 406.

left knee because they were established with medical evidence of anatomical, physiological or psychological abnormalities that were shown by medically-acceptable clinical and laboratory diagnostic techniques with clinic evidence of signs, symptoms and laboratory findings.  AR 19.

In determining Kofron's residual functional capacity ("RFC"), the ALJ noted that Kofron was intermittently compliant with prescribed CPAP therapy and alcohol abstinence.  He found that Kofron's daily activities demonstrated he was able to live and function independently and had never been given any work-related restrictions from a physician or treating source.  He also noted that Kofron was treated minimally and conservatively for his physical impairments and the medication seemed to effectively control his symptoms.  Physical examinations revealed normal functioning and no significant abnormalities of the joints, spine or range of motion.

In assessing the limitations from Kofron's mental impairments, the ALJ gave great weight to the opinion of Kofron's treating psychiatrist, Dr. Smith, who indicated Kofron has the capacity to sustain simple work.  He noted that Kofron's schizoaffective disorder causes mild restrictions in Kofron's activities of daily living and moderate difficulties in his social functioning and concentration, persistence or pace.  He also found that Kofron's mental impairments impose moderate symptoms and limitations with his capacity to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods and respond appropriately to the general public, co-workers, supervisors or normal work stress.  For these reasons, the ALJ found Kofron is limited to simple work with limited social contact.  The ALJ also found Kofron not disabled even considering his alcohol abuse.

Because the ALJ found that Kofron's past relevant work required him to engage in physical or mental work-related activities in excess of his RFC, the ALJ went on to analyze whether other jobs that Kofron can perform are available in significant numbers in the national economy.  Relying on the VE's testimony, the ALJ found that Kofron is capable of making a successful adjustment to other work, such as janitorial cleaner or

hand packer, which exist in significant numbers in the national economy. For these reasons, the ALJ found that Kofron is not disabled.

## *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities

and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative

examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, while the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court will affirm the Commissioner's decision "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that

a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse

the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## *Discussion*

### *A. Evaluation of Medical Opinions*

Kofron argues the ALJ failed to properly consider the medical opinions in the record. He asserts that Dr. Smith opined in her May 2008 letter that Kofron was unable to either obtain or maintain a job as a result of his psychiatric illness. He contends that the ALJ failed to consider these limitations in the opinion and therefore did not give it the "great weight" as stated. He argues that because of this error, Dr. Smith's opinion cannot be considered consistent with the findings of Dr. DeVore and that his opinion alone cannot constitute substantial evidence because he is a non-examining psychologist. Kofron also asserts that the additional medical evidence provided to the Appeals Council constitutes new and material evidence which requires remand.

The Commissioner responds that Kofron mischaracterizes Dr. Smith's May 2008 letter because Dr. Smith stated Kofron could perform reasonably at a simple job, which is consistent with the ALJ's RFC finding. The Commissioner also points out that Kofron's argument reflects the wrong test for disability, which is not whether an individual will be hired for a job, but whether he or she has the physical or mental capacity to perform one. Finally, the Commissioner argues the new evidence is not sufficient to alter the ALJ's decision because it is conclusory and unsupported by the other evidence in the record.

### 1. Dr. Smith's May 2008 Letter

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (quoting *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005)). In her May 27, 2008, letter to the Social Security Administration, Dr. Smith wrote that Kofron was "a bit grandiose" about his capabilities and she did not consider him to be capable of following through on his idea to get additional training in order to take a higher scale job. AR 290-91. She stated, "I think Vince could perform reasonably at a simple job. He just <u>cannot seem to get anyone to hire him</u> despite much effort." *Id.* (emphasis in original). She went on to explain, "I am convinced his interpersonal manner puts people off. They can tell he is 'not right.'" *Id.* Dr. Smith stated that Kofron was disorganized and could not seem to effectively execute a task from start to finish. For this reason, she thought "[h]e would have great difficulty with any type of a desk job." *Id.*

The ALJ discussed the May 2008 letter in two different sections of his analysis. In Step Two of the disability analysis, he pointed out that Dr. Smith opined Kofron had the capacity to perform simple work and indicated he was exploring possible employment. AR 18. In the RFC analysis, the ALJ stated, "Great weight is extended to the opinions of the claimant's treating psychiatrist, Dr. Smith, who indicated the claimant had the capacity to sustain simple work activity." AR 22. The ALJ found that Dr. Smith's opinions were supported by "the clinical signs, symptoms and findings contained in the record and corroborated by the opinions of the non-examining state agency psychologist, K. DeVore, Ph.D." *Id.*

The ALJ adequately considered all the limitations Dr. Smith outlined in her May 2008 letter and in her typewritten reports. The ALJ's RFC finding is consistent with the limitations she identified, such as simple work, excluding any desk jobs. While her other comments suggest that Kofron would have difficulty obtaining or

maintaining a job, she did not find that his psychiatric condition *prevents* him from performing work. Instead, her comments reflect a concern about Kofron's hireability, which is irrelevant to the disability determination. *See* 20 C.F.R. § 404.1566(a)(3) ("It does not matter whether . . . you would be hired if you applied for work"); *Glassman v. Sullivan*, 901 F.2d 1472, 1474 (8th Cir. 1990) (test is not whether claimant can get hired, but if she has capacity to adequately perform job"). The ALJ properly considered Dr. Smith's medical opinion and included all of the relevant limitations she identified in the RFC finding.

### 2. New Medical Evidence

The regulations describe the review process for new and material evidence as follows:

> [T]he Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b). If the Appeals Council considers the new evidence, but declines to review the case, the court reviews the ALJ's decision to determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision. *Browning v. Sullivan*, 958 F.2d 817, 823 n.4 (8th Cir. 1992).

The Appeals Council considered additional evidence that consisted of a letter from Dr. Smith dated July 2009, treatment records and lab results, a physical therapy prescription, and an impairment questionnaire and letter from Dr. Wolfgram dated October 2010. AR 10. The Council made these exhibits part of the record but denied Kofron's request for review finding that the additional information did not provide a basis for changing the ALJ's decision. AR 1-2.

Kofron argues Dr. Smith's letter and Dr. Wolfgram's reports constitute new and material evidence warranting remand. The Commissioner argues that the ALJ's decision is still supported by substantial evidence in the record as a whole, even with the additional evidence.

Dr. Smith's July 2009 letter is substantially similar to the May 2008 letter that the ALJ did consider. In the 2009 letter, Dr. Smith states Kofron has schizoaffective disorder, bipolar type, and that he is compliant with his medication and keeps his office appointments. AR 358. She explains that despite the aggressive treatment through medication, Kofron has difficulties with grooming, his psoriasis, and weight. *Id.* She states, "Between his skin, his weight, and his grooming, Vince is unlikely to be hired." *Id.* She describes his insight as "very poor" and states that his loud voice can be off-putting. *Id.* She reiterates that he is disorganized and has difficulty with task completion. *Id.* She also notes that Kofron does not have antisocial traits to his underlying personality structure. Dr. Smith concludes, "In my opinion I do not feel that he has the sufficient mental/emotional capacity to perform with sufficient pace and performance to sustain gainful employment over time." *Id.*

Like her May 2008 letter, Dr. Smith's July 2009 letter primarily expresses an opinion about Kofron's hireability. The limitations she identifies such as disorganization and difficulty with task completion are included in the ALJ's RFC finding that limits Kofron to simple, routine work. Dr. Smith stated in May 2008 that she believed Kofron was capable of such work. The 2009 letter concludes that Kofron does not have sufficient mental or emotional capacity to perform with sufficient pace and performance to sustain gainful employment over time, but Dr. Smith did not explain the basis for this change in her opinion, such as a worsening of Kofron's condition.

"Statements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'" *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir.

1996) (quoting *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991)). "A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002). Because Dr. Smith's 2009 letter contains conclusory statements that are solely for the Commissioner to make and does not include any additional medical findings to explain the inconsistency between her two opinions, it does not provide a basis for changing the ALJ's decision.

Dr. Wolfgram's impairment questionnaire is similar to the Mental Residual Functional Capacity Assessment completed by the state agency medical consultants. Dr. Wolfgram based his findings on a personal interview with Kofron and his review of the medical records. AR 369. Dr. Wolfgram diagnosed Kofron with attention deficit hyperactivity disorder ("ADHD") and schizoaffective disorder, bipolar type. AR 368. He noted several "marked limitations," especially under the categories of sustained concentration and persistence and social interactions. AR 371-72. In explaining the basis for his conclusions he wrote, "The life-long history tells it all." AR 374. In his summary, Dr. Wolfgram stated Kofron has a life-long learning disability and psychiatric disorder. AR 377. He described Kofron's psychiatric care as "extensive" which includes "the vigorous use of psychoactive drugs throughout his adult life." *Id.* He noted that Kofron's mother supports him financially and her resources are dwindling. *Id.* Dr. Wolfgram recommended social security coverage stating Kofron was "entitled to a benefit that would give him some standing." *Id.*

Dr. Wolfgram's reports do not provide a basis for changing the ALJ's decision. His diagnosis of ADHD has no support in the record from Kofron's treating physicians. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (for a medical opinion to be entitled to controlling weight, it must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record). In addition, Dr. Wolfgram's opinion is based on one visit with

Kofron and a review of the medical records. Under those circumstances, it is not entitled to great weight. *See Loving v. Dept. of Health and Human Servs.*, 16 F.3d 967, 971 (8th Cir. 1994) (a one-time evaluation by a nontreating psychologist is of little significance by itself, especially when there is substantial evidence in the record to discredit that opinion).

Dr. Wolgram's opinion is inconsistent with other substantial evidence in the record, including the opinions of Kofron's treating sources and Dr. DeVore, who found that Kofron had some moderate limitations and no marked limitations. There is no explanation for the difference in severity, such as a worsening of Kofron's symptoms, or specific examples of why Kofron is effectively precluded from performing certain activities in a meaningful manner (markedly limited) as opposed to significantly affected but not precluded from performing the activity (moderately limited). Non-examining source opinions are evaluated by the degree to which they provide supporting explanations for their opinions. 20 C.F.R. § 404.1527(d)(3). Finally, Dr. Wolfgram's report contains conclusory statements that are not supported by medical diagnoses based on objective evidence. These statements are not entitled to special significance because they invade the Commissioner's task of making the ultimate disability determination. *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

The ALJ properly considered Dr. Smith's medical opinions, including those expressed in the May 2008 letter. The subsequent opinions of Dr. Smith and Dr. Wolfgram that were provided to the Appeals Council do not provide a basis for changing the ALJ's decision. Even with these additional opinions in the record, the ALJ's decision is still supported by substantial evidence.

### B. Claimant's Credibility and the RFC Determination

Kofron argues the ALJ failed to properly evaluate the credibility of his subjective allegations. He argues the ALJ erred in the two-step analysis set forth in 20 C.F.R. § 404.1529, which describes the process for evaluating symptoms, including pain, and

requires the ALJ to first determine whether there is objective medical evidence showing the existence of a medical impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. If there is such evidence, then the ALJ must evaluate the intensity and persistence of the claimant's symptoms, and the extent to which they affect his ability to work by considering all of the evidence in the record. Kofron argues that the ALJ never made the initial determination of whether Kofron's medically determinable impairments could reasonably cause the symptoms alleged. He also argues the ALJ failed at the second step to give sufficient reasons for discounting Kofron's allegations.

The Commissioner responds that the ALJ adequately performed the two-step analysis. He identified which impairments were severe and which were non-severe because they were not established by objective medical evidence and did not impose significant functional limitations on Kofron's ability to perform basic work-related activities. The Commissioner also argues that the ALJ adequately articulated the inconsistencies he relied on in discrediting Kofron's subjective complaints and that substantial evidence supports his credibility determination.

Social Security Ruling 96-7P describes the first step of 20 C.F.R. § 404.1529 as follows:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

SSR 96-7P, 1996 WL 374186 (July 2, 1996). The ALJ found Kofron had the following severe impairments that were determined by medical evidence: alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension, and arthritis of the left knee. AR 18. He referenced 20 C.F.R. § 404.1529(a) and stated "[a]llegations of pain or other symptoms will not, standing alone, establish disability. Rather, there must be medical signs and laboratory findings that document medically determinable impairments that could reasonably be expected to produce the pain and other symptoms alleged." AR 19. The ALJ then discussed these impairments and their associated symptoms, along with the objective and subjective evidence, to determine Kofron's RFC. The ALJ clearly identified the medically determinable impairments that could reasonably be expected to produce the symptoms Kofron was experiencing as required under 20 C.F.R. § 404.1529.

The second step of 20 C.F.R. § 404.1529 is interpreted as follows:

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7P, 1996 WL 374186 (July 2, 1996). Kofron argues (a) the objective medical evidence supports a finding of disability and the ALJ erred in determining that no physicians found Kofron disabled or more limited than outlined in the RFC and (b) the

ALJ did not provide sufficient reasons for discrediting Kofron's subjective allegations. He argues the ALJ cannot discount his subjective complaints based on his conservative treatment, the fact that his symptoms did not require hospitalization, and the ALJ's personal observations of Kofron during the hearing. The Commissioner responds that the objective medical evidence before the ALJ supports his RFC determination and it was appropriate for the ALJ to consider the nature of Kofron's treatment and his personal observations, among other things, in evaluating Kofron's credibility. The Commissioner argues the ALJ adequately outlined the inconsistencies he relied on to discredit Kofron's subjective allegations and that those inconsistencies and reasons are supported by substantial evidence.

Because a claimant's RFC is a medical question, an ALJ's assessment must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may not disregard subjective complaints solely because they are not fully supported by objective medical evidence, but an ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible in light of objective medical evidence to the contrary. *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)).

The ALJ found that the objective medical evidence did not support a finding of disability. In discussing Dr. Smith's opinion, the ALJ stated, "Great weight is extended to the opinions of the claimant's treating psychiatrist, Dr. Smith, who indicated the claimant had the capacity to sustain simple work activity." AR 22. As discussed above, Dr. Smith discussed concerns about Kofron's hireability, but she did

not indicate he was incapable of performing work. Instead, she indicated that Kofron would perform "reasonably at a simple job." AR 290-91. This does not suggest that Dr. Smith found Kofron to be disabled, or even more limited than determined by the ALJ. The ALJ accurately incorporated Dr. Smith's opinion into the RFC finding by concluding that Kofron was capable of performing simple work.

Kofron's other argument is that the ALJ did not provide sufficient reasons for discrediting Kofron's subjective allegations and it was improper for him to consider Kofron's conservative treatment, lack of hospitalization for his symptoms, and personal observations in making his RFC finding. The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322. The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). The ALJ does not need to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Holstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001).

Here, the ALJ acknowledged that the *Polaski* factors should be considered. AR 20. Although he did not expressly reference *Polaski v. Heckler*, he listed factors which are identical to the ones in *Polaski*. He then discussed Kofron's credibility in considering those factors. Among the inconsistencies listed by the ALJ was Kofron's

minimal and conservative treatment despite his allegations of a disabling impairment. AR 21. The ALJ noted:

> The claimant's requirement of minimal or conservative treatment is inconsistent with the allegation of a disabling impairment. The lack of strong prescription pain medication is inconsistent with complaints of disabling pain. There is no evidence of record that the claimant's prescribed medication is not generally effective when taken as prescribed or that it imposes significant adverse side effects. There is no evidence the claimant requires the use of prescribed orthotic or assistive devices.

*Id.*

Kofron argues it was improper for the ALJ to consider the nature of his treatment and cites cases from other circuits holding (a) treatment for mental impairments cannot be considered "conservative" and (b) lack of hospitalization is an improper basis for discrediting subjective allegations of a mental impairment. Even if these holdings apply in this circuit, they are inapplicable here because the ALJ was analyzing whether Kofron's complaints from his *physical* impairments were consistent with the treatment he was receiving for them. This is evidenced by the ALJ's references to complaints of disabling pain and the lack of evidence in the record that he needs assistive devices. It is proper for an ALJ to discount subjective allegations based on the nature of the treatment and medication prescribed. *See Polaski*, 739 F.2d at 1322 (listing one of the factors as dosage and effectiveness of medication); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (considering a mental impairment and stating, "If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

The ALJ properly considered Kofron's treatment and medication when analyzing his credibility about subjective complaints of pain. The ALJ's evaluation is supported by substantial evidence. When discussing his back and knee, Kofron said he was taking Celebrex and had not discussed surgery options with any doctors. AR 62-63. He also had not undergone any tests other than x-rays for these problems. AR 53. Kofron

testified that his arthritis prohibited him from sitting for longer than four hours at a time, but after four hours he could take Ibuprofen to feel comfortable again. AR 68. He indicated that walking caused the most difficulty and pain with his arthritis and stated this was the reason he could not return to his job as a security guard, as it required him to walk around the premises. AR 65, 71. The ALJ took some of Kofron's subjective allegations of pain into account, finding that they were supported by objective evidence and limited him to light work with limited lifting and carrying and limited standing and walking. AR 19-20.

Another inconsistency the ALJ noted was the lack of evidence showing Kofron's mental condition had deteriorated since the alleged onset date to the point his treatment was no longer effective and he required hospitalization. In discussing Kofron's mental impairments, the ALJ recognized that Kofron had medically-determinable and diagnosed schizoaffective disorder, mixed type, with formal mental health treatment. He then stated that Kofron reported his only current psychotropic medication was Campral, which was used to help him abstain from alcohol. AR 21. The ALJ stated, "The condition of the claimant's mental status during the alleged period of disability has not deteriorated to such an extent that he has needed psychiatric intervention at an emergency room or inpatient psychiatric hospitalization." *Id.*

Kofron argues that he had treated with numerous psychotropic medications, including Xanax, Seroquel, Citalopram and Depakote, and the ALJ cannot discredit Kofron's allegations because he has not been hospitalized for his symptoms. As mentioned above, the dosage and effectiveness of medication is a proper factor in determining credibility. *Polaski*, 739 F.2d at 1322. It does appear the ALJ erred in stating that Kofron's only current psychotropic medication was Campral. Kofron's testimony about his psychotropic medications went as follows:

ALJ:        You take medication based on your doctor visits with Dr. Smith?

Kofron:     Yes.

| ALJ: | And how is that helping you?  Is that keeping things on an even keel or not? |
|---|---|
| Kofron: | It is for the most part. |
| ALJ: | Well, then try to explain that to me. |
| Kofron: | Yes. |
| ALJ: | What's good and what's not good. |
| Kofron: | The fact that one drug I'm taking that I think she wants to take me off of and put me on something more effective. |
| ALJ: | Okay. |
| Kofron: | in place of the, a drug called Campral, she wants to put me on a one, I can't pronounce the name, but it's a better drug that blocks a person's desire to consume alcohol. |

AR 69-70.  This was Kofron's only testimony about psychotropic medications.  He was responding to the ALJ's question about the effectiveness of his medication, not listing all of his current medications.  Although the ALJ misspoke in his opinion, it was not critical to his conclusion and does not detract from the substantial evidence supporting his conclusion.  *See Johnson v. Apfel*, 240 F.3d 1145, 1149 (8th Cir. 2001) ("Any arguable deficiency . . . in the ALJ's opinion-writing technique does not require this Court to set aside a finding that is supported by substantial evidence.").  Despite the misstatement here, the ALJ did reference exhibit 15E in this section and earlier in his opinion, which lists all of Kofron's medications.  AR 20-21, 236-37.

The ALJ properly considered the state of Kofron's psychological condition since his alleged onset date.  His analysis is supported by substantial evidence.  Kofron had previously worked with his alleged impairments as a security guard, parts picker and dishwasher.  Nothing in the record indicates he left these jobs due to his impairments and nothing suggests that his condition significantly worsened to the point of disability since his alleged onset date.  During the hearing, Kofron testified that his medications were keeping things on an even keel "for the most part."  AR 69.  By referencing the

fact that emergency psychiatric intervention or hospitalization had not been required, the ALJ acknowledged that Kofron's mental health treatment had remained consistent since he allegedly became disabled. There is no evidence that his condition substantially worsened to the point that his pharmaceutical treatment was no longer effective in controlling his symptoms. This was an appropriate consideration by the ALJ but was not heavily weighted in the credibility analysis, as the ALJ included significant mental limitations in the RFC finding.

The ALJ also considered his personal observations of Kofron during the administrative hearing. He stated, "The claimant did not appear in any obvious credible physical or mental discomfort during the course of the scheduled hearing. The claimant was able to appear, remember information and testify appropriately at the hearing." AR 21. Kofron cites *Smith v. Heckler*, 735 F.2d 312, 319 (8th Cir. 1984), and *Reinhart v. Sec'y of Health and Human Servs.*, 733 F.2d 571, 573 (8th Cir. 1984), to argue that the ALJ is not free to reject complaints based solely on personal observations made during the hearing. Kofron is correct that an ALJ's observations cannot be the *sole* basis of his decision, but "it is not an error to include his observations as one of several factors." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008). "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." *Johnson*, 240 F.3d at 1147-48.

The ALJ did not base his credibility determination solely on his personal observations of Kofron. The ALJ also considered Kofron's intermittent compliance with his CPAP therapy and recommendations to abstain from alcohol, his daily activities, the fact that none of his physicians had placed work-related restrictions on him, the results of physical examinations which contained no abnormal findings, Kofron's treatment for his physical and mental impairments which significantly helped control his symptoms and the statements from his treating physician suggesting he could perform simple work. These considerations are discussed in the ALJ's decision and are

supported by substantial evidence in the record. The ALJ's personal observations of Kofron were properly considered as one factor in evaluating Kofron's credibility.

The ALJ properly performed the two-step analysis required by 20 C.F.R. § 404.1529. He found that Kofron had severe impairments of alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension, and arthritis of the left knee that were determined by medical evidence. He then appropriately found that the objective evidence did not support a finding of disability and provided sufficient reasons for discrediting Kofron's subjective complaints in evaluating his RFC.

### C. Hypothetical Question to VE

Finally Kofron argues that the hypothetical question to the VE was flawed because the ALJ erred in adopting the limitations described by the non-examining psychologist and failed to adopt all the limitations described by Dr. Smith. He argues that the additional records submitted to the Appeals Council demonstrate that the RFC lacks substantial evidence. Kofron asserts that because the hypothetical question is flawed, it cannot constitute substantial evidence to support the Commissioner's finding that Kofron can perform other jobs that are available in the national economy. He also argues that the hypothetical question did not include all the limitations identified under the broad functional categories of deficiencies in concentration, persistence, or pace and social functioning, but only limited Kofron to simple routine work that required no interaction with the general public and interaction with co-workers and supervisors up to two-thirds of the day.

The Commissioner responds that the ALJ's hypothetical question incorporated all of the limitations the ALJ found credible. The Commissioner argues the Appeals Council properly found that the additional reports from Dr. Smith and Dr. Wolfgram were insufficient to change the ALJ's decision and the ALJ adequately incorporated all of the limitations that were identified in Dr. Smith's May 2008 letter. Finally, the Commissioner asserts that Kofron mischaracterizes the ALJ's hypothetical question and

states that the limitations identified by the ALJ appropriately capture the concrete consequences of the limitations associated with deficiencies in concentration, persistence, or pace and social functioning.

The ALJ's hypothetical question asked the VE to consider a person of the same age as Kofron and with the same education and work experience who could perform the full range of light work, but had psychological limitations. AR 90-91. The ALJ referenced the limitations in exhibit 5F and summarized them as limited to "simple, routine work only, and some social restrictions should help him deal with stress." *Id.* He clarified that this person should not have to deal with the general public and should not have to interact with co-workers or supervisors for more than two-thirds of the day. *Id.* He also credited Dr. Smith's opinion and ruled out any type of desk work because of the concentration it required. *Id.* The VE determined that Kofron could not return to his past work under this hypothetical, but could perform janitorial cleaning work and work as a hand packer. AR 91-92. Both jobs exist in significant numbers in the national economy. *Id.*

The ALJ's hypothetical included all of the necessary limitations identified in Dr. Smith's opinion, which was given "great weight" by the ALJ. As discussed above, Dr. Smith suggested that Kofron could perform simple work, but would not do well at a desk job. Her other comments related to Kofron's hireability and not his capacity or functional ability to perform work. Nor does the additional evidence call for additional limitations. As described above, that evidence consists of conclusory statements by Dr. Smith and Dr. Wolfgram and findings that are inconsistent with other evidence in the record. Because substantial evidence supports the ALJ's RFC determination even when considering the additional evidence, the ALJ's hypothetical question incorporating the limitations outlined in the RFC was appropriate.

In support of his second argument, Kofron cites *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996), to argue that the ALJ's hypothetical questions must precisely describe a claimant's limitations under the broad areas of mental functioning used in the

Psychiatric Review Technique Form and described in more detail in the Mental RFC Assessment. In *Newton*, the claimant had moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual with customary tolerances, complete a normal work week, and perform at a consistent pace without an unreasonable number and length of rest periods. *Newton*, 92 F.3d at 695. In the hypothetical question, the ALJ narrowed those limitations to an "inability to perform highly skilled or technical work" and "a capacity for simple jobs." *Id.* The court found that this hypothetical did not precisely describe the claimant's impairments and the VE could not have been expected to remember the claimant's deficiencies from the record. *Id.* The court suggested on remand that a new hypothetical question include the claimant's deficiencies of concentration, persistence, or pace to permit the VE to more accurately determine the claimant's ability to work. *Id.*

Here, the ALJ referenced the limitations in exhibit 5F, which indicated Kofron had moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. AR 297-98. The ALJ's hypothetical limited Kofron to simple, routine work, with no interaction with the general public and interaction with coworkers and supervisors for no more than two-thirds of the day. AR 90-91. The ALJ also excluded desk jobs from the consideration because they would require substantial concentration. *Id.* Unlike the hypothetical question in *Newton*, the hypothetical question here adequately captured the limitations from exhibit 5F.

The *Newton* hypothetical reduced a broad range of moderate limitations in concentration, persistence, and pace to "inability to perform highly skilled or technical

work" and "a capacity for simple jobs." *Newton*, 92 F.3d at 695. Those vague limitations did not encompass the deficiencies that were identified with regards to the claimant's difficulties with attendance, punctuality, and maintaining a consistent pace without an unreasonable number of breaks. Here, most of Kofron's identified limitations were related to social functioning. The ALJ adequately accounted for these limitations in the hypothetical by including limitations of no interaction with the general public and interaction with coworkers and supervisors for no more than two-thirds of the day. Kofron's other specific limitations in the Mental RFC Assessment were difficulties with detailed instructions, responding appropriately to changes in the work setting, and setting realistic goals and making plans independently of others. These were adequately accounted for in the hypothetical with limitations of simple, routine work and no desk jobs because of the required concentration. The ALJ's hypothetical question may not have included the limitations from the Mental RFC Assessment verbatim, but it listed Kofron's limitations with enough particularity that the VE was able to accurately determine the type of work Kofron could be expected to perform.

The hypothetical question posed to the VE constitutes substantial evidence for the ALJ to find that Kofron could perform other work available in the national economy and therefore was not disabled. It encompassed all of the credible limitations identified by Dr. Smith. The additional evidence submitted to the Appeals Council does not affect the substantial evidence in the record supporting those limitations. Moreover, the hypothetical question adequately accounted for the moderate limitations identified in the Psychiatric Review Technique Form and Mental RFC Assessment. Therefore, the ALJ was entitled to rely on the VE's testimony based upon the hypothetical question presented.

### *Recommendation*

For the reasons discussed above, the court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole and is based on

proper legal standards. Accordingly, IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision be **affirmed** and judgment be entered in favor of the Commissioner and against Kofron. Objections to the Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 25th day of October, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA