**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

VINCENT DAVID KOFRON,

              Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

No. C 11-3050-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING REPORT AND
RECOMMENDATION**

---

**TABLE OF CONTENTS**

I.     **INTRODUCTION**..............................................................................2
     *A.*     *Procedural Background* ............................................................ 2
     *B.*     *Factual Background* ................................................................ 4
          *1.*     *Summary of medical evidence* ........................................ 4
          *2.*     *Summary of the ALJ's decision* ..................................... 16

II.    *ANALYSIS* ............................................................................ 19
     *A.*     *Standard of Review*............................................................... 19
     *B.*     *Kofron's Objections* ............................................................ 24
          *1.*     *Evaluation of medical opinions*...................................... 25
               *a.*     *Dr. Smith's May 2008 Letter* ................................. 25
               *b.*     *Additional Medical Evidence* ................................. 27
          *2.*     *The ALJ's credibility determination* ................................. 29

III.   *CONCLUSION* ........................................................................ 33

## I.     INTRODUCTION

### A.     Procedural Background

This case is before me on a Report and Recommendation (docket no. 17) from United States Magistrate Judge Leonard Strand regarding plaintiff Vincent David Kofron's claim for disability insurance benefits ("DIB"), pursuant to Title II of the Social Security Act.

I quote from Judge Strand's Report And Recommendation to introduce the background of this case:

> Kofron applied for DIB on April 29, 2008, alleging disability beginning on March 28, 2008, due to sleep apnea, schizoaffective disorder, depression, hypertension, arthritis and high cholesterol. AR 167, 185. The Commissioner denied Kofron's application. AR 103–07. Kofron requested a hearing before an Administrative Law Judge ("ALJ"). AR 108. On September 29, 2009, ALJ Edward Pitts held a hearing in which Kofron and a vocational expert ("VE") testified. AR 46–99. On November 18, 2009, the ALJ issued a decision finding Kofron was not disabled. AR 16–24. Kofron sought review by the Appeals Council and submitted additional evidence. AR 36–43. The Appeals Council considered the additional evidence but found that it did not provide a basis for changing the ALJ's decision. AR 2. The Appeals Council therefore denied the request for review and the ALJ's decision became the final decision of the Commissioner. AR 1–4; 20 C.F.R. § 404.981.

Report And Recommendation at 1–2 (docket no. 17). On September 26, 2011, Kofron filed a complaint in this court, seeking review of the ALJ's decision (docket no. 2). This case was referred to United States Magistrate Judge Strand, pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. On March 23, 2012, Kofron filed his brief in support of benefits (docket no. 14). First, Kofron argued that the ALJ and the Appeals Council failed to properly consider the

medical opinions of record.  Second, Kofron contended that the ALJ failed to properly evaluate Kofron's credibility.  Third, Kofron argued that the ALJ relied upon flawed vocational expert testimony.

On May 18, 2012, the Commissioner responded with his brief in resistance (docket no. 15).  The Commissioner first argued that the ALJ properly evaluated the credibility of Kofron's subjective complaints.  Second, the Commissioner contended that the ALJ properly considered the medical opinions of record and the additional evidence presented only to the Appeals Council does not warrant remand.  Third, the Commissioner observed that the ALJ properly relied upon the vocational expert testimony to find that Kofron could perform "other work" that existed in significant numbers in the national economy.

Judge Strand issued a Report And Recommendation on October 25, 2012 (docket no. 17).  Judge Strand determined that the ALJ's decision was supported by substantial evidence in the record as a whole and recommended that the ALJ's decision denying benefits be affirmed.  Specifically, Judge Strand found that the ALJ properly considered Dr. Smith's opinions and determined that the additional opinions of Dr. Smith and Dr. Wolfgam do not provide a basis for changing the ALJ's decision.  However, Judge Strand determined that even if the additional opinions were included, the ALJ's decision would still be supported by substantial evidence.  Judge Strand found that the ALJ properly performed the two-step analysis required by 20 C.F.R. § 404.1529, and the ALJ appropriately found that the objective evidence did not support a finding of disability.  Finally, Judge Strand found that the hypothetical question posed to the vocational expert constitutes substantial evidence for the ALJ to find that Kofron could perform other work available in the national economy and Kofron was not disabled.

On November 8, 2012, Kofron filed a timely objection (docket no. 18) to Judge Strand's Report And Recommendation.   The Commissioner filed his response to Kofron's objection on November 20, 2012 (docket no. 19), in which he addressed Kofron's arguments by incorporating the arguments made in his initial brief.   The Commissioner urges me to adopt the Report And Recommendation and affirm the ALJ's finding that Kofron is not disabled.

### B.     Factual Background

In his Report And Recommendation, Judge Strand made the following findings of fact:

### 1.     Summary of medical evidence

### A. Dr. Stacey L. Smith

Dr.   Smith has been Kofron's treating psychiatrist since April 2005.  AR 290, 358.  While most of Dr. Smith's notes are illegible, the record does contain some typed reports.   In a report dated May 14, 2007, Dr. Smith noted that Kofron had "the same ongoing sleep problems that he's had for years and years, complicated by his working night shifts." AR 286.  She reported that Kofron said he wore his continuous positive airway pressure ("CPAP") machine most of the time and he was taking an occasional catnap at work.   *Id.*   Kofron told Dr. Smith that his Seroquel medication was "working fine" and his Xanax medication was keeping him in "the middle," which he described as "fine, and I'm not worrying so much." *Id.*

Dr.   Smith also noted that Kofron reported drinking 24 cans of beer per week, but said he was trying to stay away from it.   *Id.*   He had not been to an Alcoholics Anonymous ("AA") meeting lately because his father had been hospitalized. *Id.* Dr. Smith encouraged him to abstain from alcohol and Kofron stated he was going to attend AA again.  AR 286-87.

In her May 14 report, Dr. Smith also stated they discussed Kofron's job aspirations and that he exhibited a "hint of grandiosity." AR 286. For example, he had offered to build her advanced medical devices. As for his mental status, she stated:

> His mental status is the same as always. His mood is very pleasantly, consistently slightly elevated without agitation. He is extremely personable, talkative, but with some insight problems. I don't think he realizes how much training would be required for some of the job possibilities he's considering. Not suicidal, homicidal, or psychotic.

*Id.* She noted Kofron was working evening and weekend hours at a nursing home.

Another typewritten report is available from July 12, 2007. AR 255. In that report, Dr. Smith wrote that Kofron's father had passed away but things were calming down and Kofron seemed at his baseline during the session. *Id.* Kofron told Dr. Smith he was going to start working an earlier shift at work from 4:00 p.m. to 12:00 a.m. *Id.* Dr. Smith said he was happy about this and was enjoying his job at the nursing home, especially the people. *Id.* Kofron stated that he was still looking for additional part-time work and had thought about additional schooling. *Id.*

In July 2007, Kofron was still having difficulty abstaining from alcohol. *Id.* He told Dr. Smith he would occasionally drink too much beer when he was feeling frustrated. Dr. Smith stated Kofron "is always a little up and can border on a bit of agitation." *Id.* She suggested he take an extra Xanax instead of turning to alcohol.

At this appointment, Dr. Smith described Kofron's mental status as "calmer on exam, seems at baseline, pleasant, fun to talk to as usual." *Id.* He appeared well-groomed and was "personable as ever." *Id.* He had no new complaints and no prescriptions were issued. Kofron was advised to continue his medications as usual, with the exception of

5

taking extra Xanax if needed, and was again advised to abstain from alcohol. *Id.* Dr. Smith also discussed diet and exercise with him and encouraged him to switch to lower calorie beverages. *Id.*

Dr. Smith wrote a letter to the Social Security Administration on May 27, 2008. AR 290–91. She explained that Kofron is diagnosed with schizoaffective disorder, mixed type, and alcohol abuse. *Id.* She stated he takes "considerable psychiatric medication yet continues to have some difficulty" and that "[w]hile he drinks a few too many beers . . . this has not caused a significant clinical problem." *Id.*

As for his ability to work, she wrote that he was working part-time as a security officer but was terminated several months prior. She said he spends many hours on the Internet looking for other possible employment, but that he is a bit grandiose about his capabilities. She did not believe he was capable of following through on his idea to get additional training in order to take a higher scale job. *Id.* She stated that Kofron would perform "reasonably at a simple job," and that he could not get anyone to hire him despite much effort, writing: "I am convinced his interpersonal manner puts people off. They can tell he is 'not right.'" *Id.* She further noted that Kofron's mother reported his house is messy and disorganized with papers everywhere. Dr. Smith wrote, "He cannot seem to effectively execute a task from start to finish. He would have great difficulty with any type of a desk job for this reason." *Id.* Dr. Smith stated that to her knowledge, Kofron had never sustained full-time work successfully over time and opined that this was due to his psychiatric status, not to his underlying character or lack of motivation.

Dr. Smith explained that Kofron's symptoms "wax and wane." *Id.* She said, "He becomes revved-up (hypomanic) alternating with periods of irritability where he can be loud and difficult with his family." *Id.* Kofron had been hospitalized in the past, but not while she treated him.

6

She said that he attends every appointment, is always on time, and is perfectly compliant with his medications. *Id.*

Dr. Smith wrote another letter submitted to the Appeals Council dated July 15, 2009. AR 358–59. In this letter she noted that despite aggressive treatment with medication, Kofron continued to have difficulties. *Id.* He wore dirty clothing, appeared slovenly, sometimes had body odor, was "substantially overweight" and had visible lesions on his face due to psoriasis. *Id.* Dr. Smith stated that the combination of these issues made it unlikely that Kofron would be hired. *Id.* She noted that while Kofron has a very friendly and outgoing manner, he is extremely loquacious and speaks in an overly loud voice, which can be off-putting. *Id.* Dr. Smith added that Kofron becomes easily agitated when things do not go his way or if limits are set. *Id.* She described him as "incredibly disorganized" and stated he has "profound difficulty with task completion." *Id.* She said Kofron's mother lives next door to him and supports him, but finds him "a handful to manage." *Id.*

As for his impairments, Dr. Smith explained that although Kofron occasionally abuses alcohol, this is not his primary problem and does not affect his psychiatric difficulties. *Id.* She stated Kofron does not have anti-social personality disorder or anti-social traits to his underlying personality structure. *Id.* In her opinion, Kofron does not have "the sufficient mental/emotional capacity to perform with sufficient pace and performance to sustain gainful employment over time." *Id.* She added that his condition is chronic and lifelong and she doubts his level of functioning would improve significantly even with different pharmaceutical approaches. *Id.* She concluded "without his family's help, Vincent would be homeless." *Id.*

## B. Dr. James G. Avery

Dr. Avery has treated Kofron for physical impairments. In February 2008, Dr. Avery saw Kofron for pain and stiffness in his left 5th finger and soreness in his

knees.  AR 330.  In August 2008, Kofron still experienced knee pain.  AR 332.  Dr. Avery noted that Kofron had been fired for sleeping on the job.  *Id.*  Kofron was diagnosed with osteoarthritis of the knees.  *Id.*  In September 2008, Kofron complained of low back pain.  AR 333.  In January 2009, Kofron saw Dr. Avery with concerns about his skin.  AR 334.  He was diagnosed with psoriasis.  *Id.*  Kofron continued to follow-up with Dr. Avery for his back and knee pain, but no functional limitations or abnormal findings were noted outside of soreness and tenderness.  AR 382–416.

### C. Dr. Edwin Wolfgram

Dr. Wolfgram conducted an independent medical examination on October 8, 2010.  His report was submitted to the Appeals Council but not reviewed by the ALJ.  AR 368–79.  Dr. Wolfgram based his findings on a personal interview and a review of the medical records.  AR 369.  He found that Kofron was markedly limited in several areas including: ability to understand, remember, and carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to sustain ordinary routine without supervision, ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal  workweek without interruptions from psychologically-based  symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  AR 371–73.  He assigned a Global Assessment of Functioning ("GAF") score of 32[1] and concluded:

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV).  A GAF of 31 to 40

This 46-year-old gentleman is not able to adjust to a work environment. He has worked for five years total, and then irregularly. He attended special education classes in grade school. He quit high school in the 10th grade. He passed his G.E.D. (he is smart enough). He acquired a smattering of college credits over thirty years. His most active career has been hanging around colleges. He now wants to go to Iowa to participate in The Green Revolution.

Mr. Kofron has a life-long learning disability. He also has a life-long major psychiatric disorder— Schizoaffective Disorder. He has received extensive psychiatric care to include the vigorous use of psychoactive drugs throughout his adult life. He is currently under psychiatric care.

As the current psychiatrist has documented, "Mr. Kofron would be homeless if not for the support of his mother." His mother is now age 84 with dwindling resources. Drinking beer has been mentioned in the file. The alcohol use is not substantive. His family has wished alcohol was the problem, then Vincent would be less likely considered to have a mental illness.

This examiner does recommend social security coverage. Mr. Kofron is entitled to a benefit that would give him some standing.

AR 377.

Dr. Wolfgram stated that Kofron had "never been able to function" and stated "the life-long history tells it all." AR 374. He attributed Kofron's ability to work in the past to the medication he was taking, stating "the drugs must have

indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.*

been just right." AR 375. He estimated that the earliest date that the description of Kofron's symptoms and limitations applied was when Kofron was six years old and in grade school. *Id.*

### D. Consultative

Lynn Mades, Ph.D., performed a consultative examination on July 22, 2008. She noted that Kofron's allegations included sleep apnea, schizoaffective disorder, depression, hypertension, arthritis, and high cholesterol. AR 292-95. Dr. Mades noted that Kofron was well-groomed and his hygiene was within normal limits when he appeared for this appointment. AR 293. She administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) which resulted in a Verbal IQ of 100, a Performance IQ of 83, and a Full Scale IQ of 91, indicating average range of cognitive functioning overall. AR 294. She noted that during the test, Kofron attempted all the items presented and he maintained good persistence with the tasks. AR 293. She stated that his frustration tolerance appeared good, and he did not exhibit any unusual behaviors. AR 293–94. She remarked that he was quite verbose and his responses were "frequently slightly off-target" making simple responses more complicated than necessary. AR 294. She concluded that his overall motivation and effort were good. AR 294. Dr. Mades pointed out that while there was a significant difference between the verbal and performance scale scores, it was unknown whether that reflected a specific learning disability. AR 295. She found no clear evidence of cognitive impairment by history or presentation. *Id.*

### E. Washington University Sleep Center

Kofron was seen at the Washington University Sleep Center on July 17, 2006. AR 322-24. His chief complaint was that he had difficulty sleeping, which had been a problem for him the past seven years. *Id.* In his past medical history, the doctor noted his depression and schizoaffective disorder, which "resulted in multiple in-

patient hospitalizations." *Id.* Kofron explained that his work schedule required him to work from 12:00 a.m. to 8:00 a.m. on the weekends. He stated that he would try to sleep on a normal schedule during the week, but had difficulty doing this and would often wake up at 2:30 or 4:00 a.m. *Id.* The doctors assessed Kofron with possible obstructive sleep apnea and circadian rhythm shift-work disorder. *Id.* Kofron was scheduled for a split-night polysomnogram. *Id.*

The polysomnogram came back abnormal because it provided evidence of mild obstructive sleep apnea syndrome and moderate fragmentation of sleep. AR 321. A CPAP study was then performed, which resulted in normal sleep efficiency. AR 320. CPAP was deemed an effective treatment for Kofron's obstructive sleep apnea syndrome. *Id.*

At a follow-up on September 25, 2006, Kofron stated he was wearing the CPAP mask three to four nights a week for approximately four hours per night. AR 317. His only explanation as to why he did not wear it every night for the entire night was that he did not like the mask because there were too many parts to manage and the headgear was difficult to tighten. *Id.* The doctor discussed the importance of using the CPAP nightly and for the entire duration of sleep. AR 318. She also advised him that drinking alcohol may worsen his sleep apnea and she prescribed Ambien CR. AR 318–19. Kofron was instructed to follow-up two to three months later. AR 319.

Kofron returned in November 2006 and was referred to a psychologist. AR 315–16. Kofron thought his sleep difficulties might be attributed to the little activity he engaged in during the day and mentioned that he would like to exercise more. *Id.* Kofron also mentioned that he would drink beer during the day because he was bored and estimated he drank two 24-ounce cans of beer a couple times per week in order to "calm his mind." *Id.* The psychologist made the following observations:

> Mr. Kofron was very tangential and it was difficult for him to describe his typical day. When asked questions, he would switch to an unrelated topic or would switch back to a previously discussed topic. He could only vaguely answer questions, but then gave unnecessary details about unrelated topics. For example, when asked if he gets out of bed at night when he cannot sleep, he responded that he enjoys taking car trips to the country to help him relax where he can buy inexpensive meats and then listed all of the meats he usually buys. It is difficult to know how well he will remember what we discussed or what we have suggested.

*Id.* She reviewed sleep hygiene with Kofron which included no alcohol before bedtime and getting physical exercise at least 30 minutes a day. *Id.*

Kofron next saw Dr. Darla Darby, a neurologist, at his follow-up appointment a year later. AR 312-14. Kofron reported that he had found a comfortable way to wear his mask several weeks earlier and had been wearing it every night without difficulty. *Id.* He stated that he was feeling better during the day and sleeping better through the night. *Id.* He also reported that he had decreased his alcohol intake, although the doctor noted later in her report that he was drinking up to a six-pack of beer per night. *Id.* Kofron explained that the change in his work shift schedule had helped him better maintain regular sleep. *Id.* Kofron was encouraged to wean and discontinue alcohol and to continue exercising. *Id.*

## F. State Agency Medical Consultant

Kyle DeVore, Ph.D., performed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique on August 11, 2008. AR 297-310. In his Psychiatric Review Technique, he found Kofron had no limitations in activities of daily living, moderate limitations in maintaining social functioning, mild limitations in

maintaining concentration, persistence and pace, and that there was insufficient evidence to determine if Kofron had repeated episodes of decompensation of extended duration. AR 308.   Dr. DeVore concluded that Kofron's activities were largely intact with some limitations.   His intellectual capacity at worst was low-average.   AR 310. He noted that Kofron had advanced education and had worked in the same field for over 10 years.   There was no evidence that Kofron lacked the capability of performing at least simple work-related tests.   AR 310.

In his Mental Residual Functional Capacity Assessment, Dr. DeVore found moderate limitations in Kofron's ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.   AR 297–98.   In all other areas he was "not significantly limited."   *Id.*   In his summary, Dr. DeVore stated Kofron retained the capacity for performing simple work-related tasks and that social restrictions would help him deal with stress.   AR 299.

## G. Plaintiff's Testimony

Kofron testified that his most recent work was as a watchman and he had been terminated for sleeping on the job. AR 52–53. Kofron stated that he had not been sleeping, but simply resting his eyes while monitoring traffic on the property when the executive director came by and honked his horn.   *Id.*   Kofron had worked as a watchman for approximately two and a half years.   *Id.*   He explained the duties of his previous jobs as a security guard, parts picker in an auto parts warehouse and dishwasher/kitchen worker. AR 53–54.   Kofron testified that the most he would occasionally lift was 50 pounds as a parts picker and 10 to

20 pounds as a Dishwasher/kitchen worker.  AR 54–55, 57–58.

Kofron also testified about his medical conditions. He stated that he was no longer using the CPAP because the face mask was damaged but he was planning to get a new one at his next evaluation.  AR 60.  He stated that he had arthritis in his spine, elbows, toes, right knee and possibly the left knee.  AR 61.  He explained that he was taking Celebrex and his doctor had not discussed any surgical solutions or knee replacement.  AR 62–64.  He had not had any x-rays or MRIs.  *Id.*  Kofron testified that with his arthritic conditions, he could probably walk a mile before his legs would start to cramp, even with the help of his medication.  AR 65.  He estimated that he could comfortably sit for up to four hours and would then need to take Ibuprofen or another pain reliever to feel comfortable again.  AR 68.  Kofron also thought he could frequently lift 20 pounds during the day.  AR 69.  He stated that the pain in his knee was about 7 or 8 out of 10 on an average day and once or twice a month would be an 8 or 9.  AR 87-88. Kofron indicated that his hypertension and high cholesterol were under control.  AR 85.

As for his psychological condition, Kofron testified that for the most part his medication was effective.  AR 69. He stated that he had done well in school with his psychological condition but would reach a point at which he felt very discouraged and frustrated.  AR 70.  When asked what he thought caused him to feel like that, Kofron responded "[a] lot of it is interest, I think" and also attributed it to the lack of a support network.  AR 70–71. Kofron testified that he was in special education classes for behavioral problems up to the age of eight or nine.  AR 88–89.  With regard to depression and anxiety, he indicated that his depression was under control but anxiety was still a problem and was related to his drinking.  AR 85.

The ALJ asked Kofron if he could go back to his previous work as a security guard.  Kofron thought the

14

amount of walking it required would prevent him from doing that job but said he could probably do a security guard job where he could alternate sitting and standing.  AR 72–73.  When asked why he was not doing that type of work, Kofron said that no one would allow him to carry a weapon or pepper spray, but could not explain why he thought that. AR 73–74.  He later clarified that he did not think there was anything about his condition that would dissuade a potential employer from allowing him to carry pepper spray.  He stated that he was more concerned about his own protection and did not feel he could perform a security guard position without at least having pepper spray and handcuffs available. AR 81–82.  When asked again if he felt like he would be able to perform a security guard job with a sit/stand option he stated, "I don't think I want to do that for a living, you know, anymore."  AR 83.  He went on to say "I think I have more to offer to the general public and to society at large, if you like.  You know, I can do more than guard a parking lot.  I, again, like I told everybody that's in this room, that I've got more talent or talents than that."  AR 83–84.

The ALJ also asked Kofron about his daily activities. He testified that he lived by himself and could perform household chores, go shopping, and handle money by himself.  AR 74–75.  He had his driver's license and was able to drive without difficulty.  AR 76.  During the day he would do yard work and use the computer for news, research and job hunting.  AR 75.  He explained that he had spent time with friends in the past, but not recently.  AR 76. He also said he had stopped smoking but still drank alcohol. AR 76–77.  He had been attending AA for about a year and was going to start a new medication soon to help him resist alcohol.  AR 77–78.

## H. Vocational Expert Testimony

Darrell Taylor, Ph.D., testified at the hearing as a vocational expert.  AR 89-95.  Dr. Taylor identified Kofron's past work and characterized the security guard

position as light and semi-skilled, the parts picker position as medium and unskilled, and the dishwasher/kitchen worker as medium and unskilled. AR 90. The ALJ asked the VE to consider a hypothetical in which a person was the same age and had the same education and work experience as Kofron. This hypothetical person also had psychological limitations so he could only perform simple, routine work, could have no interaction with the general public, and his interaction with co-workers and supervisors could not exceed two-thirds of the work day. AR 90–91. The ALJ also ruled out any kind of desk work that would require a lot of concentration based on Dr. Smith's opinion. *Id*. The ALJ asked the VE whether this person could perform any of Kofron's past work and the VE answered "no." *Id*. However, the VE stated that other work in the regional and national economy is available to someone with these limitations. *Id*. Those jobs are considered light, unskilled work, and include janitorial cleaning positions and hand packer positions. AR 91–92. Those positions include a sit/stand option, although the VE indicated that a person would have to sit or stand a minimum of 30 minutes at a time to remain on task. AR 94.

**2.    *Summary of the ALJ's decision***

The ALJ made the following findings:

> (1) The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

> (2) The claimant has not engaged in substantial gainful activity since March 28, 2008, the alleged onset date.

> (3) The claimant has the following severe impairments: alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension, and degenerative disc disease of the left knee.[2]

---

[2] Kofron's actual diagnosis is arthritis of the left knee. AR 406.

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; and performing more than simple work with no interaction with the general public and no more than frequent contact with co-workers or supervisors.

(6) The claimant is unable to perform any past relevant work.

(7) The claimant is 45 years old, born on April 12, 1964, which is defined as a younger individual age 18–49, on the alleged disability onset date.

(8) The claimant has at least a high school education and is able to communicate in English.

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(11) The claimant has not been under a disability, as defined in the Social Security Act, from March 28, 2008 through the date of this decision.

AR 18-24. The ALJ found that Kofron has severe impairments of alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension and arthritis of the left

knee because they were established with medical evidence of anatomical, physiological or psychological abnormalities that were shown by medically-acceptable clinical and laboratory diagnostic techniques with clinic evidence of signs, symptoms and laboratory findings.  AR 19.

In determining Kofron's residual functional capacity ("RFC"), the ALJ noted that Kofron was intermittently compliant with prescribed CPAP therapy and alcohol abstinence.   He found that Kofron's daily activities demonstrated he was able to live and function independently and had never been given any work-related restrictions from a physician or treating source.  He also noted that Kofron was treated minimally and conservatively for his physical impairments and the medication seemed to effectively control his symptoms.   Physical examinations revealed normal functioning and no significant abnormalities of the joints, spine or range of motion.

In assessing the limitations from Kofron's mental impairments, the ALJ gave great weight to the opinion of Kofron's treating psychiatrist, Dr. Smith, who indicated Kofron has the capacity to sustain simple work.  He noted that Kofron's schizoaffective disorder causes mild restrictions in Kofron's activities of daily living and moderate difficulties in his social functioning and concentration, persistence or pace.   He also found that Kofron's mental impairments impose moderate symptoms and limitations with his capacity to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods and respond appropriately to the general public, co-workers, supervisors or normal work stress.  For these reasons, the ALJ found Kofron is limited to simple work with limited social contact. The ALJ also found Kofron not disabled even considering his alcohol abuse.

Because the ALJ found that Kofron's past relevant work required him to engage in physical or mental work-related activities in excess of his RFC, the ALJ went on to

> analyze whether other jobs that Kofron can perform are
> available in significant numbers in the national economy.
> Relying on the VE's testimony, the ALJ found that Kofron
> is capable of making a successful adjustment to other work,
> such as janitorial cleaner or hand packer, which exist in
> significant numbers in the national economy.   For these
> reasons, the ALJ found that Kofron is not disabled.

Report And Recommendation at 2–16 (docket no. 17).  I adopt Judge Strand's findings
of fact, as the parties have not objected to them.

## II.   ANALYSIS

### A.   Standard of Review

I review Judge Strand's Report And Recommendation pursuant to the statutory
standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of
> those portions of the report or specified proposed findings or
> recommendations to which objection is made.   A judge of
> the court may accept, reject, or modify, in whole or in part,
> the findings or recommendations made by the magistrate
> judge.   The judge may also receive further evidence or
> recommit the matter to the magistrate judge with
> instructions.

28.  U.S.C.  §  636(b)(1)  (2006);  *see*  Fed.  R.  Civ.  P.  72(b)  (stating  identical
requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a
magistrate judge but not articulating any standards to review the magistrate judge's
report and recommendation).   While examining these statutory standards, the United
States Supreme Court explained:

> Any party that desires plenary consideration by the Article
> III judge of any issue need only ask.   Moreover, while the
> statute does not require the judge to review an issue *de novo*
> if no objections are filed, it does not preclude further review

19

> by the district judge, *sua sponte* or at the request of a party,
> under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate."  *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter.  *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review").  The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'"  *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))).  Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made.  28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask.").  Consequently, the Eighth Circuit Court of Appeals has indicated *de novo*

review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520

(8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed).  The United States Supreme Court has stated that the "foremost" principle under the "clearly erroneous" standard of review "is that '[a] finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary:  a district court always

remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[3]

---

[3] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v.Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir.

Here, Kofron has objected to some of Judge Strand's findings.  Although I will review these findings *de novo*, and Judge Strand's other findings for clear error, I review the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole."  *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999)).  Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." (quoting *Haggard*, 175 F.3d at 594)).  "If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)).  Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'"  *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

### B.    *Kofron's Objections*

In his objections, Kofron challenges Judge Strand's findings that (1) the ALJ and Appeals Council properly considered the medical opinions of record; (2) the ALJ properly evaluated Kofron's credibility; and (3) the ALJ relied upon appropriate

---

2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

vocational expert testimony. While Kofron states that he "objects to all three of the Magistrate Judge's findings," Kofron has not argued in support of his objection to Judge Strand's analysis of the ALJ's treatment of the vocational expert testimony, and I find nothing clearly erroneous in Judge Strand's analysis. Kofron's Objections at 1 (docket no. 18). Therefore, I will only address the first two objections.

### 1.    *Evaluation of medical opinions*

Kofron argues that the ALJ and the Appeals Council failed to properly consider the medical opinions in the record. Kofron's argument focuses on the opinion of Kofron's treating physician, Dr. Smith, in a letter she wrote to the Social Security Administration in May of 2008, and additional medical evidence provided to the Appeals Council.

### a.    *Dr. Smith's May 2008 Letter*

Kofron contends that Dr. Smith opined in her May 2008 letter that Kofron was unable to either obtain or maintain a job as a result of his psychiatric illness. He asserts that the ALJ failed to consider the limitations Dr. Smith acknowledged in her letter, and because of this error, Dr. Smith's opinion cannot be considered consistent with the findings by the non-examining physician, Dr. DeVore. In particular, Kofron objects to Judge Strand's determination that Dr. Smith's opinion about Kofron's hireability is irrelevant and the Commissioner's Regulations only address an individual's ability to maintain a job, not the individual's ability to get hired. Kofron contends that the regulation cited by Judge Strand, 20 C.F.R. § 404.1566(a)(3), does not apply to Kofron's situation because it addresses "whether jobs are available based on the job hiring practices and other job situations available in the national economy . . . not whether the claimant's physical or mental  impairments precludes the individual from getting a job." Kofron's Objections at 1–2 (docket no. 18). Kofron contends that Judge Strand selectively ignored Dr. Smith's opinion that Kofron "cannot obtain a job

based on his mental presentation and other selected findings reported by the treating source." *Id.* at 2.

Kofron mischaracterizes Dr. Smith's letter by stating that Dr. Smith pronounced Kofron unable to find or keep a job as a result of his mental disability.  This view fails to acknowledge that Dr. Smith determined that Kofron "could perform reasonably at a simple job.  He just cannot seem to get anyone to hire him despite much effort."  AR 290–91.  (emphasis in original).  She explained, "I am convinced his interpersonal manner puts people off.  They can tell he is 'not right.'"  *Id.*  Yet she also observed that Kofron "attends every appointment, is always on time, and is perfectly compliant with his medications. He is well-liked here in the office." *Id.*  Based on his mother's description of his messy home, "with papers everywhere," Dr. Smith concluded that Kofron "would have great difficulty with any type of a desk job."  *Id.*  Dr. Smith did not determine that Kofron's mental disabilities would prevent him from obtaining employment, but merely commented on his difficulties in the job search process.  In light of her concern about his hireability, Dr. Smith still found that he is capable of working and did not indicate that he would be unable to find a job.

By acknowledging Kofron's off-putting interpersonal manner, Dr. Smith addressed a factor that impairs his ability to get a job, not his ability to perform a job. *See* 20 C.F.R. § 404.1566(a)(3); *Thomas v. Sullivan*, 928 F.2d 255, 261 (8th Cir. 1991 ("The issue of hireability is not to be considered in disability hearings."); *Glassman v. Sullivan*, 901 F.2d 1472, 1474 (8th Cir. 1990) ("Under the Social Security regulations, the test for disability is not whether an individual can actually get hired for a job, but whether he or she has the physical and mental capacity to adequately perform one."). "An individual is not disabled . . . due to an inability to be hired for any particular job or specific hiring practices of employers. Rather, the test is whether the particular job is within the claimant's physical and mental capabilities." *Warford v. Bowen*, 875 F.2d

671, 674 (8th Cir. 1989) (citations omitted) (concluding that claimant's 132 rejections during employment search do not indicate disability). In determining the RFC, the ALJ placed "great weight" on Dr. Smith's determination that Kofron has the capacity to perform simple work activity. Therefore, I agree with Judge Strand's determination that the ALJ properly considered Dr. Smith's medical opinion and included all of the relevant limitations she identified in the RFC analysis.

### b.    *Additional Medical Evidence*

Kofron asserts that the additional medical evidence provided to the Appeals Council constitutes new and material evidence, warranting remand. The Appeals Council considered additional evidence that consisted of a July 2009 letter from Dr. Smith and an October 2010 report from Dr. Wolfgram, but denied Kofron's request for review.

First, Kofron objects to Judge Strand's finding that Dr. Smith's July 2009 letter primarily addresses Kofron's hireability and is not new. Kofron also objects to Judge Strand's finding that the opinions from Dr. Smith are on the issue of disability, which is reserved to the Commissioner. Kofron contends that Dr. Smith's July 2009 letter contains new evidence because it addressed Kofron's mental impairments that relate to work performance. He also claims that it does not show worsening, but the limited state he was in during the period at issue.

The Eighth Circuit Court of Appeals has held that the court must consider whether remand is required when evidence submitted to the Appeals Council is (a) new, (B) material, and (c) related to the period on or before the date of the ALJ's decision. *See Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990). Kofron argues that the *Williams* test is satisfied. He contends the evidence is new, related to the period at issue, and material "because the mental limitations found by the treating and examining

psychiatrists directly contradict the limitations found by the ALJ."  Plaintiff's Brief at 12.

I agree with Judge Strand's determination that Dr. Smith's 2009 letter is substantially similar to her May 2008 letter and it does not provide a basis for changing the ALJ's decision.  In the new letter, Dr. Smith reiterates her concerns about Kofron's hireability.  She addresses limitations that were included in the ALJ's RFC finding that Kofron is capable of simple, routine work.  In the 2009 letter, Dr. Smith states, "In my opinion I do not feel that he has the sufficient mental/emotional capacity to perform with sufficient pace and performance to sustain gainful employment over time."  AR 358.  Yet, this statement lacks support, such as additional medical findings, and fails to explain how her 2009 opinion relates to her 2008 opinion.  The 2009 letter contains mere conclusory statements and does not provide a basis for changing the ALJ's decision.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) ("A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."); *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996) ("Statements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'").

Second, Kofron objects to Judge Strand's conclusion that the evidence from examining psychiatrist, Dr. Wolfgram, does not provide a basis for changing the ALJ's decision.  Kofron contends that Judge Strand improperly reweighed the evidence presented.  After a personal interview with Kofron and a review of his medical records, Dr. Wolfgram diagnosed Kofron with attention deficit hyperactivity disorder and schizoaffective disorder, bipolar type.  Dr. Wolfgram's conclusion, "The life-long history tells it all," AR 374, did not provide sufficient support for his diagnosis.  *See*

*Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) ("A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'"). Dr. Wolfgram's opinion is not entitled to controlling weight. *See Loving v. Dept. of Health and Human Servs.*, 16 F.3d 967, 971 (8th Cir. 1994) (concluding that "a one-time evaluation by a nontreating psychologist is of little significance by itself," particularly when "there is substantial evidence in the record to discredit the psychologist's opinion"). Dr. Wolfgram's opinion is inconsistent with other substantial evidence in the record, and he fails to provide sufficient support or an explanation for the difference in severity.

Therefore, I agree with Judge Strand's determination that the ALJ properly considered Dr. Smith's medical opinions, including the May 2008 letter. Also, I agree with Judge Strand's finding that the additional opinions of Dr. Smith and Dr. Wolfgram that were provided to the Appeals Council do not warrant a remand and the ALJ's decision is supported by substantial evidence.

### 2.    The ALJ's credibility determination

Kofron maintains that the ALJ, in making his credibility determination, failed to properly evaluate Kofron's credibility of his subjective complaints. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). When evaluating a claimant's subjective complaints, an ALJ must employ the multi-factor standard articulated by the Eighth Circuit Court of Appeals in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which examines "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (quoting *Medhaug v. Astrue*,

578 F.3d 805, 816 (8th Cir. 2009), in turn citing *Polaski*, 739 F.2d at 1322). Nonetheless, "[t]he ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* at 932 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)). Rather, "[t]he ALJ need only acknowledge and consider those factors before discounting a claimant's subjective complaints." *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004). The ALJ may also consider "the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 931–32 (citing *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008)). Additionally, "acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility," *id.* at 932 (citing *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)), and the ALJ may discredit "a claimant's subjective complaints if there are inconsistencies in the record as whole,'" *id.* (quoting *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008)). The failure to seek medical treatment may reflect adversely on the credibility of a claimant's subjective complaints. *See Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 2008)). Courts generally defer to an ALJ's credibility finding when the ALJ "'explicitly discredits the claimant's testimony and gives good reason for doing so.'" *Halverson*, 600 F.3d at 932 (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)). The Eighth Circuit Court of Appeals has cautioned judges against "substitut[ing] [their] opinion for that of the ALJ, who is in a better position to assess credibility." *Eichelberger*, 390 F.3d at 590 (citing *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996)).

Kofron objects to Judge Strand's analysis of the credibility determination. The ALJ sufficiently performed the two-step analysis under 20 C.F.R. § 404.1529. First,

the ALJ identified Kofron's severe impairments: alcohol abuse, schizoaffective disorder, mild obstructive sleep apnea, hypertension, and arthritis of the left knee. Pursuant to 20 C.F.R. § 404.1529(a), the ALJ clearly analyzed these impairments, along with the objective and subjective evidence, to determine Kofron's RFC. Second, giving "great weight" to the opinion of treating psychiatrist Dr. Smith, the ALJ evaluated the objective medical evidence, which did not support a finding of disability. *See* 20 C.F.R. § 404.1529(d)(2); *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009). The ALJ properly included Dr. Smith's opinion that Kofron would perform "reasonably at a simple job" in the RFC analysis by concluding that Kofron was capable of performing simple work. AR 290–91.

Kofron argues that the ALJ did not provide proper reasons for discrediting Kofron's subjective allegations. Although the ALJ did not expressly reference *Polaski v. Heckler*, his analysis of Kofron's credibility includes all of the *Polaski* factors. The ALJ adequately evaluated the factors set forth in *Polaski*, finding that the inconsistencies indicated Kofron's subjective allegations were not credible. Among the inconsistencies the ALJ found between Kofron's treatment for pain and his subjective complaints of pain were: that Kofron had not discussed surgery options; that he had not undergone any tests other than x-rays; and that he could treat his arthritis with Ibuprofen to feel comfortable. The ALJ properly evaluated the subjective allegations based on the nature of the treatment and medication prescribed. *See Polaski*, 739 F.2d at 1322 (considering the factor: "dosage, effectiveness and side effects of medication"). The ALJ considered Kofron's subjective allegations of pain and his RFC reflects his limitations.

The ALJ also properly considered Kofron's mental condition and his analysis is supported by substantial evidence. In particular, the ALJ properly observed that Kofron's mental health treatment had remained consistent and there was no evidence

31

that his condition has substantially deteriorated to require psychiatric intervention or hospitalization. *See Peterson v. Astrue*, No. 07-4068, 2008 WL 4323717, at *21 (D. Minn. September 18, 2008) (finding that the ALJ properly determined that plaintiff's lack of "emergency room visits, hospitalizations, psychiatric care and instability in the use of medications" was inconsistent with his complaint of a totally disabling mental impairment.). The ALJ properly observed that Kofron's mental limitations were controlled by medications. *See Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (considering a mental impairment and noting, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling."). The ALJ's decision includes a misstatement that Kofron's only current psychotropic medication was Campral, but this error was not critical to his conclusion and the references to exhibit 15E in the decision (listing all of Kofron's medications) indicate the ALJ was aware of the other medications. The ALJ properly observed that Kofron had previously maintained employment with his alleged mental impairments and there is no evidence in the record to indicate that his impairments have worsened or caused him to stop working. The ALJ included significant mental limitations in the RFC finding.

Based on his personal observations of Kofron at the administrative hearing, the ALJ stated, "The claimant did not appear in any obvious credible physical or mental discomfort during the course of the scheduled hearing. The claimant was able to appear, remember information, and testify appropriately at the hearing." AR 21. The ALJ properly included his observations, "as one of several factors," in the credibility determination. *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008); *see Johnson v. Apfel*, 240 F.3d 1145, 1149 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations."). In addition, the ALJ cited the following inconsistencies based on substantial evidence in the record: Kofron lives independently and manages his own

household chores; he has a driver's license and drives; his physical examinations contained no abnormal findings; he received only minimal conservative treatment; no physician has ever placed any specific work-related restriction on his activities more restrictive than found in the hearing decision; and he was only intermittently compliant with prescribed CPAP therapy and alcohol abstinence.

Therefore, because substantial evidence in the record as a whole supports the ALJ's decision to discount Kofron's subjective complaints, I agree with Judge Strand that the ALJ's credibility determination was proper. *See Page*, 484 F.3d at 1042. I will not "substitute [my] opinion for that of the ALJ, who is in a better position to assess credibility." *Eichelberger*, 390 F.3d at 590.

## III.   CONCLUSION

THEREFORE, I find that the ALJ's determination that Kofron is not disabled is supported by substantial evidence in the record as a whole. Judge Strand recommended that the ALJ's decision be affirmed and that judgment be entered in favor of the Commissioner and against Kofron. I agree and thus **accept** Judge Strand's Report And Recommendation (docket no. 17).

**IT IS SO ORDERED**.

**DATED** this 14th day of December, 2012.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA